IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | |
| | ) | No. 37731-8-III |
| RICARDO OCHOA DIMAS, | ) | |
| | ) | UNPUBLISHED OPINION |
| Petitioner. | ) | |

SIDDOWAY, J. — Ricardo Ochoa Dimas seeks relief from personal restraint in the form of a sentence to 576 months of total confinement for his 2017 convictions of second degree murder, first degree assault, and first degree unlawful possession of a firearm. Woven through his pro se petition are over three dozen ostensible grounds for relief, few of which are supported by specific facts, the evidence available to support the facts, or citation to the court documents in which the evidence can be found. We requested a response from the State, which has provided evidence refuting his discernible claims.

Appointed counsel provided facts and evidence in support of one of Mr. Dimas's[1] claims of ineffective assistance of trial counsel, but deficient representation is not shown. The petition is dismissed.

_____

[1] We refer to the petitioner as "Mr. Dimas," which is how he self-identifies throughout his petition.

No. 37731-8-III
*In re Pers. Restraint of Dimas*


FACTS AND PROCEDURAL BACKGROUND

On the night of January 22, 2016, April Jackson and her girlfriend Leticia Diaz were at the apartment of Jackson's aunt, Anna Hargett, when Ms. Diaz left to meet Tabatha Bevins, and then returned with Bevins and two of Bevins's friends. Ms. Bevins and her friends wished to acquire some heroin, and Ms. Hargett arranged to acquire some on their behalf, fronting the $100 cost that she then collected from one of Ms. Bevin's friends. Disappointed with the quality of the heroin the young women wanted their money back, but, after contacting the seller, Ms. Hargett said that was not possible. Although Ms. Diaz offered to reimburse their $100 out of an upcoming paycheck, Ms. Bevins and her friends left the Hargett apartment unhappy, with Ms. Bevins stating "it's not over," and that they would be back. Rep. of Proc. (RP)[2] at 78.

Ms. Bevins and her friends went to see Ricardo Dimas, who was nearby, to enlist his help. On being told what had happened, Mr. Dimas shared their indignation and, according to Ms. Bevins, suggested going back to the apartment to "try to make it right." RP at 131. Ms. Bevins later recalled him saying, "[I]t's not right, . . . that's his hood and it's not going to go down like that." RP at 135. Mr. Dimas and his acquaintance, "Flex,"

---

[2] Citations to the "Rep. of Proc." and "RP" are to the verbatim report of proceedings taking place on August 22 and August 28-31, 2017, prepared in connection with Mr. Dimas's direct appeal. Proceedings taking place on August 23 and 24, 2017, were not transcribed at that time but were obtained and provided in support of the State's response to Mr. Dimas's petition. They are cited as Resp't's App. E and G.

2

traveled to the Hargett apartment, as did the three women, where Ms. Bevins knocked on the door.

What transpired thereafter was captured on a surveillance camera trained on the porch and front door of the apartment, albeit without sound. As summarized in this court's opinion in Mr. Dimas's direct appeal, Ms. Diaz answered the door, stepped outside, and began arguing with Mr. Dimas and the others. After several minutes, Ms. Hargett and Ms. Jackson displaced Ms. Diaz at the front door and the verbal confrontation continued and grew more heated. *State v. Dimas*, No. 35549-7-III, slip op. at 2 (Wash. Ct. App. Apr. 23, 2019) (unpublished).[3]

Mr. Dimas had been fidgeting with something near his right-hand front pocket earlier, and when Ms. Hargett and Ms. Jackson came outside, Mr. Dimas can be seen in the video removing a firearm from the area of his right pants pocket and holding it by his side, pointing it toward the ground. *Id.* Ms. Jackson and Ms. Diaz later testified at trial that Ms. Hargett told Mr. Dimas and his companions to leave. Ms. Jackson claimed that she was shouting, and her aunt, who was "angry" and increasingly "frustrated," told Ms. Bevins, Mr. Dimas and the others to leave "several times." RP at 212. Ms. Diaz recalls Ms. Hargett and Ms. Jackson telling them to "get the fuck out of here." RP at 86.

This court's opinion recounts what is seen next on the surveillance video:

---

[3] Available at www.courts.wa.gov/opinions/pdf/355497_unp.pdf.

The video then depicts the following events over the course of less than five seconds: Ms. Hargett moved around her niece as Mr. Ochoa Dimas stepped away from the wall and turned his body to face the front door. Mr. Ochoa Dimas was still holding the gun in his right hand, pointing it toward the ground. Mr. Ochoa Dimas and Ms. Hargett then exchanged words. At that point, the video shows Mr. Ochoa Dimas's gun in full view, within the possible eyesight of Ms. Hargett. Ms. Hargett then pulled an ax from behind her body and lunged at Mr. Ochoa Dimas. Mr. Ochoa Dimas put up his left arm in an apparent attempt to shield himself and took several steps backward. Ms. Hargett then started to lower the ax. As she did so, Mr. Ochoa Dimas fired a shot at Ms. Hargett.

The bullet fired by Mr. Ochoa Dimas went through Ms. Hargett's chest and then traveled to hit Ms. Diaz in the neck.

*Dimas*, slip op. at 3. Mr. Dimas and his companions fled the scene. Police arrived and Ms. Hargett and Ms. Diaz were taken to the hospital. Ms. Diaz recovered from her wounds; Ms. Hargett did not. She bled to death within a matter of minutes after being shot.

The State charged Mr. Dimas with five felony counts: second degree murder, second degree felony murder, first degree assault, first degree unlawful possession of a firearm, and second degree unlawful possession of a firearm. Mr. Dimas retained private counsel, John Crowley, to defend him.

Mr. Dimas exercised his right to a jury trial of the murder and assault counts, which proceeded to a 4-day trial that began on August 22, 2017. Mr. Dimas testified on his own behalf and claimed he shot Ms. Hargett in self-defense after she stepped toward him with the ax.

4

Based on the evidence admitted at trial, the trial court provided the jury with a full panoply of self-defense instructions, including instruction on the duty to retreat and a first aggressor instruction. The jury found him guilty as charged. In a bench trial on the firearm charges that followed, the trial court found him guilty of those charges.

Mr. Dimas appealed and obtained partial relief from this court in the form of directions to the trial court to strike his convictions on counts 2 and 5 on double jeopardy grounds, and to strike the $100 DNA[4] collection fee. Among his assignments of error that were rejected on appeal was his contention that the court erred by giving the first aggressor instruction. This court held that the giving of the instruction was proper, explaining:

> [T]he video evidence shows Mr. Ochoa Dimas drew his gun and positioned himself squarely in front of Ms. Hargett's door prior to being threatened with an ax. Given the context—a heated confrontation over drug money and refusal to leave after repeated requests—the mere act of pulling out a firearm and holding it in a low-ready position was an act of provocation, likely to elicit a belligerent response. The initial aggressor instruction was appropriate.

*Dimas*, slip op. at 5.

Mr. Dimas also contended that the prosecutor committed misconduct in closing, by arguing he had a duty to retreat. That argument, too, was rejected by this court, which

---

[4] Deoxyribonucleic acid.

5

reasoned that the State properly argued Mr. Dimas had a duty to retreat "for two distinct

reasons":

> First, the no duty to retreat standard applies only to individuals whose
> presence is lawful. At the time of the shooting, Mr. Ochoa Dimas had no
> right of continued presence because his limited license as a visitor to the
> front door area of Ms. Hargett's home had been revoked. Second, the right
> to stand one's ground does not apply to an initial aggressor.

*Id.* at 7 (citations omitted).

Mr. Dimas petitioned the Washington Supreme Court for review of the arguments

rejected by this court. Review was denied. *State v. Dimas*, 193 Wn.2d 1035, 447 P.3d

150 (2019). The mandate issued on September 10, 2019.

*Personal restraint petition*

Mr. Dimas, acting pro se, filed his personal restraint petition on September 9,

2020, a day before the one-year anniversary of the mandate. The only supporting

declaration filed was one from his wife, Christine Dimas. The next day, September 10,

he filed a 56-page document with the heading "EXHIBIT" on each page, the first 31

pages of which are unauthenticated exhibits. Pages 32 through 56 contain further

argument in support of his petition. The day after that, September 11, he filed what was

self-described as an exhibit list explanation. It was an unsigned narrative that explained

each exhibit filed the prior day.

6

Under RAP 16.8.1, this court conducts a preliminary review of a personal restraint petition and may dismiss it without calling for a response if it is clearly frivolous or statutorily barred. If not, and if it has not been improperly transferred to this court by the superior court, this court will request a response from the State. *Id.* This court requested a response to Mr. Dimas's petition from the State.

Rather than a response, the State initially filed a motion to strike most of Dimas's petition and its supporting documents. Discussing Mr. Dimas's petition by section, it addressed the dearth of citations to the record, the lack of supporting declarations or authentication of exhibits, and the irrelevance of some of Mr. Dimas's arguments and unauthenticated support.

The State's motion triggered a series of new evidentiary submissions from Mr. Dimas, which the State requested be struck in a second motion to strike.

Our commissioner granted the State's motions to strike in part. With respect to the first motion, the commissioner expressed concern that were she to grant the motion, she would be dismissing virtually the entire petition. Comm'r's Ruling, *In re Pers. Restraint of Dimas*, No. 37731-8-III, at 5 (Wash. Ct. App. Apr. 20, 2021) (on file with the court). She reasoned that whether to grant such draconian relief was best determined by the acting chief judge (ACJ) or a panel, who would consider the petition on the merits.

7

*Id.* She granted the second motion to strike, with leave to Mr. Dimas to file a motion to supplement his petition. *Id.* at 5-6. No motion to supplement was filed.

The State then filed a response that, with permission, was overlength, and contested every issue it discerned in the petition. It provided citations to supporting materials and was accompanied by a 774-page appendix of 34 exhibits.

In February 2022, this court's ACJ entered an order appointing counsel to provide supplemental briefing on Mr. Dimas's behalf. At the same time, the ACJ resolved the State's first motion to strike, granting meritorious aspects of that motion so that Mr. Dimas's counsel would be aware of limits on the evidence on which the brief could rely. On the court's own motion, it transferred to this proceeding the record and briefing from Mr. Dimas's earlier appeal (the clerk's papers, verbatim reports of proceedings, trial exhibit SE-2 (the surveillance video) and appellate briefs). The ACJ ruled that Mr. Dimas's unsworn factual allegations in the petition would be disregarded to the extent unsupported by the trial court record, the appendix materials provided by the State, or the nonhearsay matters asserted in the declaration of Christine Dimas. Mr. Dimas's exhibits were struck for lack of authentication and his explanation of exhibits was struck as irrelevant. Appointed counsel was directed to file a supplemental brief "limited to the issues raised in the petition and evidence already on file with the court." Ord. Appointing

8

Counsel, *Dimas*, No. 37731-8-III, at 1 (Wash. Ct. App. Feb. 10, 2022) (on file with the court).

Counsel's supplemental brief for Mr. Dimas provided evidence and argument in support of a single issue: counsel argued that Mr. Dimas's trial lawyer provided ineffective assistance by failing to object to trial testimony that before the fatal shot was fired, Ms. Hargett and Ms. Jackson had been demanding that Mr. Dimas and the others leave. Counsel argued it was that testimony, which it contended was hearsay, that provided the basis for the first aggressor instruction and "gutted [Mr. Dimas's] assertion of self-defense." Suppl. Br. of Pet'r at 2.

ANALYSIS

Relief by way of a collateral challenge to a conviction is extraordinary, requiring the petitioner to meet a high standard before this court will disturb an otherwise settled judgment. *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011) (citing *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 810-12, 792 P.2d 506 (1990)). When seeking postconviction relief on the basis of trial court error, a petitioner must demonstrate that he was actually and substantially prejudiced as a result of constitutional error or that the trial suffered from a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice. *In re Pers. Restraint of Swagerty*, 186 Wn.2d 801, 807, 383 P.3d 454 (2016). These heightened showings must

be made by a preponderance of the evidence. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 17, 296 P.3d 872 (2013). The court considers the totality of circumstances in determining whether the burden is met. *In re Pers. Restraint of Brockie*, 178 Wn.2d 532, 539, 309 P.3d 498 (2013).

The petitioner must state the facts on which the claims of unlawful restraint are based and the evidence available to support the factual allegations, a rule that "is critical to the outcome of most PRPs."[5] *In re Pers. Restraint of Moncada*, 197 Wn. App. 601, 604, 391 P.3d 493 (2017) (citing RAP 16.7(a)(2)). The requirement "'enabl[es] courts to avoid the time and expense of a reference hearing when the petition, though facially adequate, has no apparent basis in provable fact.'" *Id.* at 605 (quoting *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992)). Bald assertions and conclusory allegations are not sufficient, nor are arguments made only in broad general terms. *Id.*; *In re Pers. Restraint of Rhem*, 188 Wn.2d 321, 327, 394 P.3d 367 (2017).

I.      THE ORIGINAL PETITION FAILS TO SET FORTH BASIC GROUNDS FOR RELIEF

Mr. Dimas's pro se petition is largely narrative, twice interrupted by numbered reasons why his incarceration is unlawful—reasons that are sometimes elaborated on, and sometimes added to by the otherwise free-flowing narration. The first challenge

---

[5] Personal restraint petition.

presented by the petition has been to identify what we have determined to be 37 reasons

Mr. Dimas claims his incarceration is unlawful.

      *A.*     *Identification of issues raised by the petition*

      Mr. Dimas's grounds for relief begin at page 9 of the petition, with 20 issues that

he numbers 1 through 22 (failing to identify any as #4 or #7).  Since this is the first of

two sets of enumerated issues, we preface his numbering with a "I":

| **Ineffective assistance of trial counsel** | | |
|---|---|---|
| No. | PRP Page | |
| I.1 | 9 | Failure of Crowley to inform of plea offer and sentencing issues |
| I.2 | 9 | Failure of Crowley to attend first day of voir dire |
| I.3 | 9 | Failure of Crowley to object to juror questioning in chambers |
| I.9 | 10 | Failure of Crowley to interview State witnesses or present evidence |
| I.10 | 10 | Failure of Crowley to communicate with client |
| I.11 | 10 | Failure of Crowley to effectively challenge State evidence |
| I.12 | 10 | Failure of Crowley to attend hearings |
| I.20 | 11 | Failure of Crowley to request "missing witness" instruction re: Kristina Sampson Jones |
| I. 22 | 12 | Failure of Crowley to object to Jackson testimony re: Hargett statement |
| | | |
| **Violation of public trial right** | | |
| I.5 | 9 | Part of voir dire conducted in closed courtroom |
| I.6 | 9 | Juror questioning in chambers |
| I.8 | 10 | Sealing juror records without *Bone-Club*[6] analysis |
| I.16 | 11 | Sealing surveillance video |
| | | |

---

[6] *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).

| **Judicial comment on the evidence** | | |
|---|---|---|
| I.13 | 10-11 | Unidentified statement by Judge Michael McCarthy |
| | | |
| **Improper judicial disqualification** | | |
| I.14 | 11 | Honoring State affidavit of prejudice filed on July 21, 2017 |
| | | |
| **Abuse of discretion in granting continuance** | | |
| I.15 | 11 | Continuance for joining a protective order granted February 19, 2017 |
| | | |
| **Prosecutorial misconduct** | | |
| I.17 | 11 | Misleading court re: first aggressor instruction |
| I.18 | 11 | False attribution to defendant of "make it right" statement |
| I.19 | 11 | False characterization of defendant as "malicious trespasser" |
| | | |
| **Instructional error** | | |
| I.21 | 12 | Incomplete first aggressor instruction (omitting "words alone" language) |

Following this itemization is an approximately 14-page narrative discussion of some, but not all, of these issues.

The vast majority of Mr. Dimas's asserted grounds for relief are unsupported by any citation to the record or other evidence. He seldom identifies resulting prejudice and never offers reasoned argument why any prejudice is actual and substantial.

Mr. Dimas identifies, as one of his claims of ineffective cross-examination, that Mr. Crowley did not impeach Ms. Bevins with her criminal history and inconsistent statements she had made when interviewed by Detective Gonzalo Deloza. Pet. at 14, (Gonzalo, RP 178, 278). This relates to Issue I.11.

12

He accuses "[t]he state or one of its agents" of improperly redacting Ms. Bevin's statement of exculpatory testimony. Pet. at 16. This appears to be an additional issue of prosecutorial misconduct, which we will label Issue I.19a.

He asserts that his public trial right was violated when the public was told that voir dire had been cancelled on August 23, 2017, and it was, instead, moved to a courtroom not open to the public. Pet. at 17. This relates to Issue I.5.

He asserts that his public trial right was violated again on August 24, 2017, when the trial court conducted private questioning of jurors in the judge's chambers. Pet. at 17. This relates to Issue I.6.

He asserts that trial judge Michael McCarthy improperly commented on the evidence by signing his instructions to the jury with the word "Guilty." Pet. at 18. This relates to Issue I.13.

He asserts that an affidavit of prejudice filed against Judge Blaine Gibson by the prosecutor on July 21, 2017, was too late, where Judge Gibson had made a discretionary ruling on March 2, 2016. Pet. at 20. This relates to Issue I.14.

He asserts that Mr. Crowley provided ineffective assistance of counsel by failing to object to the late-filed affidavit of prejudice. *Id.* This appears to be an additional issue of ineffective assistance of counsel that we will refer to as Issue I.22a.

He has several complaints about a protective order that was granted authorizing the State to withhold the surveillance video from the public until the trial. He complains that a hearing on the State's motion was continued once, with the prosecutor failing to give notice to Mr. Crowley, thereby depriving Mr. Dimas of his right to representation. Pet. at 21. This appears to be an additional issue of prosecutorial misconduct that we refer to as Issue I.19b.

He also complains about the granting of the motion for a protective order, arguing, "If the video had been broadcast the public would have been inclined to agree that this was clearly self-defense." *Id.* This relates to Issue I.15.

He asserts that state agents were put on notice that there was other surveillance video of what had transpired outside the Hargett home that would have been exculpatory and therefore was required to be procured and produced by the State. Pet. at 22-24. This appears to be his first mention of a *Brady*[7] issue, which we will refer to as *Brady* 1.

He asserts that when the court entertained objections about jury instructions, the prosecutor was asked by the judge whether *State v. Hawkins*, which the prosecutor had referenced, was "'the house party case'" and said that it was, yet the case that involved a house party was actually *State v. Bea.*[8] Pet. at 24. This relates to Issue I.17. He also

---

[7] *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[8] *Hawkins* is reported at 89 Wash. 449, 154 P. 827 (1916); *Bea* is reported at 162 Wn. App. 570, 254 P.3d 948 (2011).

14

argues that the cases relied on by the State were distinguishable from the facts of his case. *Id.* at 24-25. This, too, relates to Issue I.17.

At page 25, a new subject matter is introduced under heading, "Brady Violation." First are allegations about an officer, Gabriel Ramos, that would reflect on the officer's credibility and that Mr. Dimas alleges were not disclosed. Pet. at 25. We refer to this issue as *Brady* 2.

Next, also under a "Brady Violation" heading, are complaints about the conduct of witness interviews by Detective Deloza and Deputy Ryan Pepper. Mr. Dimas complains that where both officers were State witnesses, it was a "conflict of interest" for them to interview other State witnesses. Pet. at 26. Since this appears to accuse the State of prosecutorial misconduct rather than a *Brady* violation, we refer to this as Issue I.19c.

Mr. Dimas accuses the officers and several prosecutors of witness tampering and encouraging State witnesses to testify untruthfully. Pet. at 26. Since this, too, is an allegation of prosecutorial misconduct, we refer to it as Issue I.19d.

He asserts that on the last day of trial, when proceedings were in recess and other lawyers were out of the room, one of the prosecutors obtained the already-admitted surveillance video (Ex. SE-2) from the court clerk, but then returned an "altered version" to the clerk as a substitute. Pet. at 27. This is a further allegation of prosecutorial misconduct that we refer to as Issue I.19e.

15

At the bottom of page 28, continuing to page 29, Mr. Dimas elaborates on an allegation introduced at pages 25 and 26: that the State was aware of a 57-page statement from Kristina Sampson Jones, one of Ms. Bevins's friends who was present at the shooting, which Mr. Dimas claims was exculpatory. He asserts that the statement was either suppressed, or Ms. Jones was not permitted to testify, or she was released from custody knowing that she was a material witness and was unlikely to appear. We refer to this further allegation of prosecutorial misconduct as Issue I.19f.

Next, at page 29 of the petition, under the heading, "Ineffective Assistance of Appellant Counsel" (some capitalization omitted), Mr. Dimas includes his second set of enumerated issues, identifying ways in which he alleges that Marie Trombley, the lawyer who represented him in his direct appeal, "was ineffective for failing to assign error." Pet. at 29. This being the second set of enumerated issues, we preface his numbering of the issues with a "II." He contends that Ms. Trombley was ineffective for failing to assign error to:

II.1. Closure of the court during voir dire on [A]ugust 23, 2017.

II.2. Questioning the Jurors in chambers on August 23, 2017.

II.3. Trial counsel performing voir dire from a hotel room while under the influence of a controlled substance.

II.4. Sealing all records pertaining to all jurors on October 6, 2017.

II.5. The state filing an untimely affidavit of prejudice on Judge Gibson.

> II.6.  Trial Counsel not impeaching Tabitha Bevins, Christina
> Coronado, April Jackson, Detective Deloza and Leticia Diaz.
>
> II.7.  Ineffective trial counsel.

Pet. at 29 (numbering modified).

To summarize, we identify 37 grounds that Mr. Dimas contends are bases for relief, which we refer to as Issues I.1 - I.3, I.5 - I.6, I.8 - I.22, I.19 and I.19a - I.19f, I.22a, *Brady* 1 - 2, and II.1 - II.7.

> B.      *State's response and our analysis*

Since the State was required to file its response before we granted some of the relief requested by its motion to strike, its 68-page response errs on the side of caution by treating Mr. Dimas's unsworn assertions in the petition as potentially sufficient under RAP 16.7(a)(2) and (3).  In addition, it frequently addresses multiple bases on which a given claim for relief fails.

This court's preliminary review of Mr. Dimas's petition was approached with caution, given this court's familiarity with other cases in which Mr. Crowley had provided ineffective assistance of counsel.[9]  With the benefit of hindsight, many of Mr.

---

[9] Mr. Crowley's resignation from the Washington State Bar with its attached "Statement of Alleged Misconduct" before the Disciplinary Board of the Washington State Bar Association is available at https://www.mywsba.org/WebFiles/CusDocs /000000019868-0/0321.pdf.

       The three divisions of this court have found Mr. Crowley to have provided ineffective assistance of counsel in some prior petitions and appeals.  *See, e.g.*, *In re Pers.*

Dimas's claims of error could have been disposed of summarily. We dismiss them for

the following reasons, as further explained hereafter.

> We dismiss 18 of his claims of error (I.5, I.6, I.3, I.8, I.11, I.16, I.13, I.15, I.18, I.19, I.19a, I.19c, I.19d, I.19f, I.20, I.21, *Brady* 1, and *Brady* 2) for failing to show even arguable error.
>
> We dismiss 9 of his claims of constitutional error (I.1, I.2, I.9, I.10, I.12, I.17, I.19b, I.19e, and 1.22a) for failing to make a prima facie showing of actual and substantial prejudice.
>
> We dismiss 1 of his claims of nonconstitutional error (I.14) for failing to make a prima facie showing that his trial suffered from a fundamental defect that inherently resulted in a complete miscarriage of justice.
>
> We dismiss his 7 claims of ineffective assistance of appellate counsel because he fails to demonstrate that "errors" he contends should have been assigned were viable claims of error.
>
> We address Mr. Dimas's claim that Mr. Crowley should have objected on hearsay

grounds to testimony about demands that Mr. Dimas leave the Hargett home in section II

of the opinion.

> 1.  With respect to 18 of Mr. Dimas's grounds for relief, he fails to show even arguable error

A petitioner's restraint must be unlawful for one or more of the reasons identified

by RAP 16.4(c). The petition is required to state the facts underlying the claim that the

---

*Restraint of Owens*, No. 32694-2-III (Wash. Ct. App. Jan. 31, 2017) (unpublished), http://www.courts.wa .gov/opinions/pdf/326942_pub.pdf; *and see In re Pers. Restraint of Fowler*, 197 Wn.2d 46, 479 P.3d 1164 (2021). Nevertheless, Mr. Crowley was capable of providing competent representation in criminal matters. For reasons explained by our opinion, Mr. Dimas fails to demonstrate that Mr. Crowley provided ineffective assistance in his case.

petitioner's restraint is unlawful, and the evidence available to support the factual allegations. *Rice*, 118 Wn.2d at 885-86; RAP 16.7(a)(2)(i). If the evidence exists in court records, the petitioner must, at a minimum, identify the records and where they can be found. *In re Pers. Restraint of Ruiz-Sanabria*, 184 Wn.2d 632, 639, 362 P.3d 758 (2015).

Issue I.5 contends that the trial court violated Mr. Dimas's right to a public trial by conducting part of voir dire (the August 23, 2017 proceeding) in a jailhouse courtroom that he alleges is not generally open to the public. Pet. at 9, 17. He also alleges that his wife was misled by the court administrator to believe that "voir dire had been cancelled" that day, but he provides no supporting declaration from Ms. Dimas on that score. Pet. at 17.

The 11-page transcript of the abbreviated proceedings that took place on August 23, 2017, reveals that the trial judge announced the proceedings as taking place in open court. Resp't's App. E at 3 ("We're on the record here in open court."). Mr. Dimas provides no evidence that the courtroom was *not* open on August 23. As addressed hereafter, the court was convened for only a short period of time that day, because defense attorney Crowley was suffering from a back problem that prevented him from attending. No public trial violation is shown.

Issue I.6 alleges that the trial court also violated Mr. Dimas's right to a public trial by holding private questioning of prospective jurors in the judge's chambers on August 24, 2017. Pet. at 9, 17. He contends that jurors 11, 32, 35, 75, 83 and 100 were questioned in chambers, but provides no evidence that the questioning took place in chambers. The transcript of voir dire taking place on August 24 reveals that all of the "private" questioning of individuals took place outside the presence of other prospective jurors, but in an open courtroom. *See* Resp't's App. G at 12-28 (reflecting that individually questioned prospective jurors "entered the courtroom" and "left the courtroom"). No public trial violation is shown.

Issue I.3 contends that defense counsel Crowley provided ineffective assistance of counsel by failing to object to juror questioning in chambers. Pet. at 9, 17. No questioning of jurors in chambers has been demonstrated, however.

Issue I.8 complains of the trial court's posttrial "sealing" of juror records without a *Bone-Club* analysis. Following the conclusion of trial, and after receiving a request for the jurors' names and telephone numbers, the trial court entered an order prohibiting the release of juror information, analyzing it as an issue under GR 31(j). It found no good cause to release the information and, instead, reasons for withholding it from release. Resp't's App. K at 1-2.

No. 37731-8-III
*In re Pers. Restraint of Dimas*

In *Bone-Club*, our Supreme Court identified the criteria that article I, section 22 of the Washington Constitution requires a trial court to weigh before closing a public hearing. 128 Wn.2d at 258-59. Restricting the release of juror questionnaires following an open jury selection process is not a closure subject to an article I, section 22 claim, however. *State v. Beskurt*, 176 Wn.2d 441, 447-48, 293 P.3d 1159 (2013) (lead opinion); *id.* at 456 (Stephens, J., concurring).[10] The trial court did not err by failing to engage in a *Bone-Club* analysis.

Issue I.11 is one of the few instances in which Mr. Dimas points to facts on which he relies. He contends he received ineffective assistance of counsel because Mr. Crowley did not use impeachment material against State witnesses. As factual support, he identifies criminal history information and inconsistent statements he claims should have been used to impeach Ms. Bevins, but were not.

A successful ineffective assistance of counsel claim requires a defendant to show that counsel's performance was deficient and that the defendant was prejudiced by the deficient performance. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 840, 280 P.3d 1102 (2012) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Representation is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness. *State v. Grier*, 171 Wn.2d 17, 33,

_____

[10] The justices may well have been unanimous on this issue, but Justice Madsen, in her concurring opinion, chose to decide the appeal on the basis of issue preservation.

21

246 P.3d 1260 (2011). *Strickland* defined prejudice as the "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,'" with a "'reasonable probability'" being "'a probability sufficient to undermine confidence in the outcome.'" *Crace*, 174 Wn.2d at 840 (quoting *Strickland*, 466 U.S. at 694). Our Supreme Court held in *Crace* that a petitioner who satisfies the *Strickland* standard has necessarily met his burden to show actual and substantial prejudice. *Id.* at 846-47.

As the State points out, Mr. Crowley used his cross-examination of Ms. Bevins to obtain her testimony that Mr. Dimas had not gone to the Hargett home for the purpose of threatening, bullying, or shooting anyone, and never made any threats to do so. He elicited testimony from Ms. Bevins that the victim was a lot more aggressive than Mr. Dimas. Ms. Bevins also testified that when she saw Ms. Hargett swing the axe she was scared, not knowing what Ms. Hargett was going to do. Finally, Mr. Crowley obtained Ms. Bevins's testimony that after the gun was fired, Mr. Dimas immediately retreated and left.

It was undisputed that Mr. Dimas fired the fatal shot. The surveillance video would be compelling evidence. As a result, any helpful testimony Mr. Crowley could obtain from eyewitnesses was critical. The State argues that Mr. Crowley likely wanted the jury to *believe* Ms. Bevins's testimony, so there was a legitimate reason to avoid

22

impeachment that would lessen her credibility and risk evoking hostile responses. We agree. And well-settled case law requires us to engage in a strong presumption that counsel's representation was effective. *E.g.*, *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Mr. Dimas fails to demonstrate that Mr. Crowley's decision not to use impeachment material against Ms. Bevins was not tactical.

Issue I.16 complains of the trial court's granting the State's motion for a protective order, pursuant to RCW 42.56.540, to enjoin pretrial disclosure of the surveillance video. Resp't's App. C (Mem. of Points & Auth. in Supp. of Mot. for Protective Ord.). A local television station had requested a copy under the Public Records Act, chapter 42.56 RCW. *Id*. The State argued that "[l]aw enforcement has legitimate concerns that releasing the video would endanger the lives and/or physical safety of the witnesses depicted," and "[t]he release and subsequent broadcast of the video would likely taint the jury pool." *Id*. at 4, 5 (boldface omitted). At the hearing on the motion, the prosecutor represented that he had spoken with defense counsel Crowley, who "indicate[d] over the telephone that the defense would join in the state's motion." Resp't's App. D at 1. Mr. Dimas offers no evidence that Mr. Crowley did not indicate agreement with the protective order.

The trial court authorized the withholding of the video only "until the date of trial . . . or until such time as the . . . matter has been permanently concluded via other means."

23

Resp't's App. C at 6.  Mr. Dimas fails to make any reasoned argument why granting that temporary protection, particularly where the parties agreed, was error.  *See Rhem*, 188 Wn.2d at 327-28 (a PRP must contain more than a conclusory allegation or broad, general claims; supporting argument is required).

Issue I.13 complains of a judicial comment on the evidence, contending that Judge Michael McCarthy, who presided at trial, communicated to jurors before their deliberations that Mr. Dimas was guilty.  Judges are prohibited by article IV, section 16 of the Washington Constitution[11] from "conveying to the jury his or her personal attitudes toward the merits of the case." *State v. Becker*, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997). A message suggesting the judge believed the defendant guilty would unquestionably be an improper comment on the evidence.

The fact on which Mr. Dimas relies, however, is his assertion that the following handwriting above the signature line on the instructions given to the jury is not Judge McCarthy's signature, but is, instead, "M Guilty":

DATE 8/30/17

JUDGE
MICHAEL McCARTHY

---

[11] "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law."

*See* Resp't's App. K. He contends that this is unlike other signatures of Judge McCarthy. But the State demonstrates otherwise, with these examples:



*See id.* The facts do not support Mr. Dimas's contention that the judge wrote "M Guilty" on the instructions.

Issue I.15 complains that Judge Blaine Gibson committed error by granting a continuance of the State's motion for an order temporarily preventing disclosure of the surveillance video. Pet. at 11. A hearing on the State's motion was originally set for February 22, 2016. On February 19, 2016, the State filed a motion to continue the February 22 hearing to March 2, supported by an affidavit attesting that the prosecutor to whom responsibility for the hearing was newly-assigned would be out of town the week of February 22. Resp't's App. D. An attorney's unavailability is good cause for a continuance. *E.g.*, *State v. Heredia-Juarez*, 119 Wn. App. 150, 153, 79 P.3d 987 (2003). No abuse of discretion is shown.

Issue I.18 alleges the prosecutor committed misconduct during closing argument by falsely attributing to Mr. Dimas an intent, in going to the Hargett home, to "make it right." Yet during her direct examination, Ms. Bevins testified multiple times that in deciding to confront Ms. Hargett and the others, Mr. Dimas had expressed the need for them to "make it right." *See* RP at 131, 140, 151. Following up on this repeated testimony, Mr. Crowley asked Ms. Bevins the following questions and got the following answers:

> Q. You used this term during your examination by [the prosecutor], make it right. You used that phrase numerous terms. Was Ricardo using that term?
>
> A. Yes.
>
> Q. Did it sound to you like—I mean, you seem to know his heart. You've known him since he was 12. Did he sound genuine about it?
>
> A. Yes.

RP at 151. Even Mr. Dimas testified at trial that he used the phrase. Asked if he had a role in the discussion between Ms. Bevins and Ms. Diaz that preceded the shooting, he answered, "At one point I looked over told Leticia, just figure it out. Make it right." RP at 317. The testimony provided a reasonable evidentiary basis for the prosecutor's closing argument.

Issue I.19 alleges the prosecutor committed misconduct by falsely characterizing Mr. Dimas, during closing argument, as a "malicious trespasser," even though Mr. Dimas

and his group approached Ms. Hargett's door in an alley that was open to the public. The prosecutor never referred to Mr. Dimas as a malicious trespasser in the presence of the jury, however. He used the term "malicious trespasser" a single time, in discussing jury instructions outside the presence of the jury. As the court had noted, for a trespasser to be characterized as a first aggressor, "I think there has to be a malicious trespass." RP at 370. The prosecutor responded that case law supported giving the instruction, "as the 'owner of property may lawfully use reasonable force to expel a malicious trespasser.'" *Id.* (quoting *Bea*, 162 Wn. App. at 578). No misconduct is shown.

Issue I.19a accuses "[t]he state or one of its agents" of improperly redacting a statement given by Ms. Bevins of exculpatory testimony. Pet. at 16. There is no identification of when or how the redacted statement was allegedly misused or the defense was prevented from using her allegedly exculpatory information. This is insufficient to merit review under RAP 16.7(a)(2)(i).

Issue I.19c asserts it was a conflict of interest for law enforcement officers who would be serving as witnesses to interview other State witnesses. Pet. at 26. It is commonplace in criminal trials for the State to rely on testimony from both prescient witnesses and law enforcement officers who interviewed those witnesses. No authority is cited by Mr. Dimas for his contention that this presents a conflict of interest.

27

Issue I.19d is a contention that one of the deputies tried to persuade Ms. Sampson Jones that Mr. Dimas did not act in self-defense, which Mr. Dimas contends is witness tampering; he also accuses officers and prosecutors of knowing that witnesses were untruthful and encouraging them to testify untruthfully, but without any specifics whatsoever. Pet. at 26. Here again, because of the failure to identify facts and the evidence supporting them, the issue does not merit review under RAP 16.7(a)(2)(i).

Issue I.19f attributes fault to the State for the fact that Kristina Sampson Jones, one of Ms. Bevins's friends present at the shooting, was not called as a trial witness. Mr. Dimas refers to her testimony as "suppressed" and asserts that the State "had Sampson Jones in custody several times on a material witness warrant" but "[a]fter taking her statement they allowed her to leave custody on her own recognizance, knowing it would be unlikely she would return." Pet. at 28-29.

Mr. Dimas provides no particularized facts or evidence as a basis for this issue, but the State responded with the following evidence: the State filed motions for the apprehension of Ms. Sampson Jones as a material witness on November 1, 2016, February 14, 2017, and August 4, 2017. Resp't's App. V. On July 5, 2017, she was arrested on a material witness warrant and was transported to Yakima County on July 7. Resp't's App. T. Law enforcement interviewed her that day, and her interview was

recorded and transcribed. Resp't's App. Q. The transcript was made electronically available to Mr. Crowley and records reveal that he downloaded it. Resp't's App. N.

As the State points out, once arrested on a material witness warrant, it is the court that determines whether a material witness should be released or detained. *See* CrR 4.10(c). Mr. Dimas fails to demonstrate that Ms. Sampson Jones's absence from trial was the result of State misconduct.

Issue I.20 contends Mr. Crowley provided ineffective assistance by failing to request a missing witness instruction addressing Ms. Sampson Jones. A missing witness instruction tells jurors that if a person who could have been a witness is not called to testify, the jurors may be able to infer that the person's testimony would have been unfavorable to a party. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 5.20, at 194 (5th ed. 2021) (WPIC). Mr. Dimas assumes the court would have instructed jurors they could infer that Ms. Sampson Jones's testimony would have been unfavorable to the State.

The missing witness instruction is to be given sparingly, and only if three requirements are met, one being that "the witness must be peculiarly available to the party" against whom the inference is to be drawn. *Id.* cmt. at 194. Mr. Dimas makes no reasoned argument that the requirements for use of the instruction could be met in the case of Ms. Sampson Jones. It would be surprising if they could be, since the State had

been required to apply for three material witness warrants in order to obtain her arrest and a statement. *See State v. Houston-Sconiers*, 188 Wn.2d 1, 30, 391 P.3d 409 (2017) (where court had issued a material witness warrant and neither party knew whether witness would appear, the witness was not peculiarly available to the State).

Issue I.21 alleges that the trial court committed instructional error by failing, in giving the pattern first aggressor instruction, to include the optional/bracketed language, "Words alone are not adequate provocation for the defendant to be the aggressor." 11 WPIC 16.04, at 269. The note on use states that the bracketed language is to be used "as applicable." *Id.*

Mr. Crowley argued that no first aggressor instruction should be given. RP at 368-69. In that connection, he argued that the only possible basis for labeling Mr. Dimas an aggressor was words, disputing that Mr. Dimas could fairly be characterized as a trespasser. *Id.* The court disagreed, finding that escalating tensions caused by Mr. Dimas's and the others' refusal to comply with demands to leave was an adequate basis for giving the instruction. RP at 372-73.

When the court then afforded counsel the opportunity to object or take exceptions to its jury instructions, as required by CrR 6.15(c), the only defense objection was to giving a first aggressor instruction at all. *See* RP at 377. Since there was no exception

taken to giving the instruction without the bracketed language, the court did not err by failing to include it.

Issue *Brady* 1 asserts that the State committed a *Brady* violation by failing to secure and provide the defense with allegedly exculpatory video of what transpired outside the Hargett home that Mr. Dimas contends existed. He fails to identify what other video he believes existed and why he believes it would be exculpatory.

"A *Brady* violation occurs when a prosecutor suppresses 'evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *In re Pers. Restraint of Mulamba*, 199 Wn.2d 488, 497, 508 P.3d 645 (2022) (alteration in original) (quoting *Brady*, 373 U.S. at 87). For *Brady* to be violated, the withheld evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. *Id.* at 498.

The prosecution is not responsible for evidence not under its control, including materials held by private parties who would cooperate with the government. *Id.* at 499-500 (citing *State v. Mullen*, 171 Wn.2d 881, 901, 259 P.3d 158 (2011)). "Where a third party possesses documents essential to the defense, the proper mechanism for the defense to obtain the information is through a subpoena." *Mullen*, 171 Wn.2d at 902. "If a third

party fails to honor the subpoena and later the defendant discovers exculpatory or pivotal impeachment evidence, the proper mechanism to challenge his criminal conviction is through a motion based on newly discovered evidence." *Id.* No *Brady* violation is shown.

Issue *Brady* 2 asserts the State did not reveal to the defense that Officer Gabriel Ramos "had lied under oath previously, or that he was under investigation for assaulting his ex-wife," or that "he had an affair with the babysitter of his infant twins and his wife had placed a domestic violence restraining order on him," which Mr. Dimas contends would be "impeachment evidence to cast doubt on his credibility." Pet. at 25. The allegations about Officer Ramos are followed by Mr. Dimas's statement, "See attached declaration of Susan Ramos," but no declaration from Ms. Ramos was attached to or filed in support of the petition. No evidence is provided that supports the allegations about Officer Ramos, nor does Mr. Dimas identify where evidence supporting the allegations could be found. *See* RAP 16.7(a)(2), (3). Mr. Dimas's bald assertions and conclusory allegations are an insufficient basis for requesting relief.

2.  With respect to 9 of Mr. Dimas's claims of constitutional error, he fails to make a prima facie showing of the required prejudice

Unless a petitioner can make a prima facie showing of actual and substantial prejudice resulting from a constitutional error, the petition will be dismissed. *Cook*, 114 Wn.2d at 810; *In re Pers. Restraint of Khan*, 184 Wn.2d 679, 686, 363 P.3d 577

32

(2015) (petition may be dismissed as frivolous); *Coats*, 173 Wn.2d at 166-68 (Stephens, J., concurring).

*Ineffective assistance of counsel.* Mr. Dimas's claims of ineffective assistance of counsel allege constitutional error under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. *Grier*, 171 Wn.2d at 32.

Mr. Dimas fails to identify prejudice resulting from his claims of ineffective assistance of trial counsel. A number of his claims allege acts or omissions that, even if deficient representation, are not inherently prejudicial. With respect to the following claims, the failure to identify prejudice is fatal: Issue I.1 (failure to inform client of plea offer and sentencing consequences); Issue I.9 (failure to interview State witnesses or call defense witnesses); Issue I.10 (failure to communicate with client); Issue I.12 (failure to attend hearings); and Issue I.22a (failure to object to untimely affidavit of prejudice against Judge Gibson).

Mr. Dimas provides somewhat more detail on his Issue I.2, which complained of ineffective assistance for his trial counsel's failure to attend the first day of voir dire. Even so, ineffective assistance is not shown. Trial was set to begin on August 22, 2017, with prospective jurors scheduled to appear that afternoon. *See* RP at 3. Mr. Crowley

33

was in attendance. *Id.* Members of the venire evidently completed questionnaires and identified any hardship requests.

Before trial the next morning, Mr. Crowley notified the court and counsel via e-mail that he was having a problem with his back and would be unable to attend. *See* Resp't's App. E. He phoned in and participated telephonically as the trial court briefly reviewed and announced its decision on 10 hardship requests. *Id.* Neither the State nor Mr. Crowley objected to the court's decisions whether to excuse the jurors. *Id.*

The court then inquired whether Mr. Crowley thought he would be better by the next day. Mr. Crowley said he expected to be better and explained, "This happens every six months or so, your Honor. I take medication, don't sit down for a good period, six or eight hours, and it will resolve itself. Right now sitting is impossible." *Id.* The trial court elected to proceed by excusing the prospective jurors for the day, and confirming later in the day that Mr. Crowley would be able to go forward on August 24. *Id.* That is what transpired, and Mr. Crowley was present in court for voir dire thereafter. Mr. Dimas fails to demonstrate that Mr. Crowley's participation by telephone in reviewing the hardship requests and his causing suspension of voir dire for a day was deficient representation or prejudicial.

*Prosecutorial misconduct.* Prosecutorial misconduct is not attorney misconduct in the sense of violating rules of professional conduct. *State v. Fisher*, 165 Wn.2d 727,

740 n.1, 202 P.3d 937 (2009).  It is, instead, a term of art that refers to "prosecutorial mistakes or actions [that] are not harmless and deny a defendant [a] fair trial."  *Id.*  Such a claim alleges a deprivation of a defendant's right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington Constitution.  *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703, 286 P.3d 673 (2012).  Where an objection to prosecutorial misconduct was not made at trial, the claim is considered waived unless the misconduct is so flagrant and ill intentioned that it caused an enduring and resulting prejudice that could not have been neutralized by a curative instruction.  *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 539, 397 P.3d 90 (2017) (citing *In re Pers. Restraint of Caldellis*, 187 Wn.2d 127, 143, 385 P.3d 135 (2016)).

Mr. Dimas fails to identify prejudice, or articulate how it was actual and substantial, with respect to three of his claims of prosecutorial misconduct.

His Issue I.17 complains that the prosecutor confused the facts of the *Hawkins* and *Bea* decisions in responding to the trial court's questions about giving a first aggressor instruction.  There is no reason to believe that confusing the facts involved in those cases affected the trial court's decision to give the instruction.

Issue I.19b contends that when the State moved on February 19, 2016, to continue the hearing of its motion for a protective order, the prosecutor represented to the court

35

that "the issue of the defendant's designated legal counsel has not yet been settled" but he "assume[d] that the defense would have no objection to a continuance." Resp't's App. C. In fact, Mr. Crowley had filed a notice of appearance two days earlier. Resp't's App. X.

According to the record, Mr. Crowley never objected to the protective order and allegedly even joined in requesting it. Mr. Dimas does not demonstrate that the prosecutor's misunderstanding or oversight that Mr. Crowley had appeared and was entitled to notice resulted in any prejudice.

Issue I.19e is the claim of prosecutorial misconduct asserted by the declaration of Christine Dimas, who accuses one of the prosecutors, Andrew White, of requesting trial exhibit SE-2 from the court clerk following its admission, and then "returning" to the clerk an "altered" DVD, as a substitute for the exhibit. Ms. Dimas claims to have seen Mr. White do this after court recessed on August 31, 2017. She was still present, waiting for her husband to be transported back to the jail.

Ms. Dimas concludes that an altered DVD was substituted because she obtained a copy through a public record request after the trial and she claims it was "completely different" from one she had watched on Mr. Crowley's laptop a couple of days earlier. She claims that the video she watched on Mr. Crowley's computer captured Ms. Hargett swinging the axe "several" times at Mr. Dimas before he "fires one shot in self defense" and Ms. Hargett "proceeds to chase him down the alley still swinging the axe." Decl. of

Christine Dimas, *Dimas*, No.37731-8-III, at 1 (Wash. Ct. App. Sept. 9, 2020). Ms.

Dimas claims to have told Mr. Crowley about Mr. White's alleged substitution of

evidence at the time, but Mr. Crowley "obviously did nothing." *Id.* at 2.

The State responds with evidence that exhibit SE-2 was a series of video clips

created for use at trial and could have looked different from a copy Mr. Crowley had

obtained of the original recording.

For several reasons, the scenario recounted by Ms. Dimas makes no sense. First,

exhibit SE-2 was used by Mr. Crowley in his opening statement and was used off and on

with witnesses throughout the trial. True, it was available to jurors during their

deliberations, but they deliberated for a total of only 96 minutes (*see* Resp't's App. F)

and it is entirely possible they did not review the video during their deliberations.

Everything of import had already been shown to them and discussed with witnesses

during the trial. If something "completely different" had been substituted, it would have

been noticed.

Second, none of the witnesses testified that after Mr. Dimas shot Ms. Hargett,

she chased him down the alley swinging the axe at him. Finally, the case had been

submitted to jurors for their deliberations at 3:47 p.m. on August 30, not August 31.

Resp't's App. F. The jury returned its verdict the morning of the 31st. *Id.*

In any event, Mr. Dimas does not demonstrate actual and substantial prejudice. The jurors heard three days of testimony during which the attorneys repeatedly showed them portions of the video deemed important. If the jurors did review the video again, Mr. Dimas is unable to demonstrate that it would have outweighed the evidence presented in the courtroom.

> 3.  With respect to 1 of Mr. Dimas's nonconstitutional grounds for relief, he fails to make a prima facie showing that his trial suffered from a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice

While a petitioner alleging a constitutional ground for relief must show actual and substantial prejudice, a petitioner alleging a nonconstitutional ground must make the even stricter showing of a fundamental defect that inherently results in a complete miscarriage of justice. *See Cook*, 114 Wn.2d at 811 (standard is "stricter than the 'actual prejudice standard'"). Mr. Dimas's Issue I.14 complains that the superior court honored an affidavit of prejudice against Judge Blaine Gibson that the State filed on July 19, 2017, which was well after Judge Gibson made a discretionary ruling on March 2, 2016, granting the State's motion for a protective order preventing pretrial disclosure of the surveillance video.

Mr. Dimas does not even attempt to make the required showing that having Judge McCarthy preside at trial rather than Judge Gibson inherently resulted in a complete miscarriage of justice.

4.      Mr. Dimas's 7 claims of ineffective assistance of appellate counsel fail to demonstrate that "errors" he contends should have been assigned were viable claims of error

"If a petitioner raises ineffective assistance of appellate counsel on collateral review, he or she must first show that the legal issue that appellate counsel failed to raise had merit." *In re Pers. Restraint of Dalluge*, 152 Wn.2d 772, 777-78, 100 P.3d 279 (2004) (citing *In re Pers. Restraint of Maxfield*, 133 Wn.2d 332, 344, 945 P.2d 196 (1997)). "Second, the petitioner must show that he or she was actually prejudiced by appellate counsel's failure to raise the issue." *Id.* at 778.

Issues II.1 and II.2 assert that appellate counsel Trombley provided ineffective assistance of counsel by failing to assign error to closure of the court during voir dire on August 23 and questioning of jurors in chambers on August 24.[12]  Pet. at 17, 29.  Because no closure of court or questioning of jurors in chambers on those dates has been shown, however, assigning error to court closures on those days would not have had merit.

Issue II.3 contends that Ms. Trombley provided ineffective assistance by failing to argue that Mr. Crowley provided ineffective assistance of counsel by reporting his back troubles to the court on the morning of August 23, 2017, and participating by telephone in abbreviated proceedings that were then continued.  We have already held that Mr.

---

[12] At page 29 of his petition, Mr. Dimas refers to the questioning in chambers as taking place on August 23.

Dimas fails to demonstrate that this was deficient representation or prejudicial, so assigning error would not have had merit.

Issue II.4 asserts that Ms. Trombley provided ineffective assistance of counsel by not challenging the trial court's posttrial order denying the release of juror information under GR 31(j). Not only have we held that the order was not erroneous, no objection had been made in the trial court, so Ms. Trombley would have been raising an issue that, if error, was unpreserved. RAP 2.5(a).

Issue II.5 asserts that Ms. Trombley provided ineffective assistance of counsel by not assigning error to the untimely affidavit of prejudice filed against Judge Gibson, but here again, since no objection had been made in the trial court, any error would be unpreserved.

Issues II.6 and II.7 assert that Ms. Trombley provided ineffective assistance of counsel by not contending that *Mr. Crowley* provided ineffective assistance at trial, through failures to impeach State witnesses with unidentified material or in other unidentified ways. Mr. Dimas fails to identify the facts that would support those claims and demonstrate that Mr. Crowley's decisions were not tactical.

II.   MR. DIMAS FAILS TO DEMONSTRATE THAT MR. COWLEY PROVIDED INEFFECTIVE
      ASSISTANCE OF COUNSEL BY FAILING TO OBJECT TO TESTIMONY ABOUT DEMANDS
      TO LEAVE

We finally turn to Issue I.22, that "[t]rial counsel was ineffective for not objecting

to hearsay evidence by April Jackson on Hargett's alleged statement." Pet. at 12

(underlining omitted). Appointed counsel provided supplemental briefing on this issue,

expanding the challenge by arguing that testimony about demands by Ms. Hargett and

Ms. Jackson that Mr. Dimas and the others leave the Hargett home was hearsay, and

"trial counsel's failure to object to [the] inadmissible hearsay gutted [Dimas's] assertion

of self defense." Suppl. Br. of Pet'r at 2.

A.   Facts and evidence relied on

With supplemental briefing by counsel, this claim for relief provides the facts

relied on and the supporting evidence. At pages 7 through 9 of the supplemental briefing,

counsel identifies the occasions when, it is contended, Mr. Crowley should have objected

to testimony as hearsay.

The first is during the direct examination of Ms. Diaz, as the prosecutor showed

her portions of the surveillance video and asked her what was happening. "Cheeto" is the

name Ms. Diaz used to refer to Mr. Dimas. The highlighted language is the testimony

Mr. Dimas argues was objectionable:

    Q.   Let me ask you this: Prior to this, before you're pulled inside, at
         any point did you tell them they need to leave?

41

A.    No. I just argued with them.

Q.    At this point does April Jackson ask Cheeto to leave?

A.    *Yes. Anna and April are both saying, get the fuck out of here.*

RP at 85 (emphasis added). A bit later, Ms. Diaz testifies:

Q.    When you're in the house, what's Anna doing to get around you? Does she push you out of the way? Does she pull you back in?

A.    Yes. She's pushing me out of the way.

Q.    *Do you remember if she told everybody they needed to leave?*

A.    *She told them to get the fuck out of here.* That's when she went to get the ax. Cheeto started getting more closer towards us, and *she told him to get the fuck out of here.*

RP at 86 (emphasis added).

Mr. Dimas contends that the following highlighted testimony from Ms. Jackson was also objectionable:

Q.    So after you brought Leticia back in, what did you do?

A.    Well, just argued for a minute, argued with them.

Q.    About the money?

A.    Yes.

Q.    Do you remember who you were talking to specifically?

A.    I remember asking—I remember asking Cheeto or Ricardo who he was. I said, and who are you? Who in the—are you? I remember arguing with Tabatha a lot.

Q.    Were you pretty angry?

A.    Mm-hmm, yes.

Q.    *Did you tell them you didn't want them to be there anymore?*

A.    *Several, several times.*

. . . .

Q. *But you did ask them to leave?*

A. *Yes.*

Q. *Were you shouting at them to leave?*

A. *Probably a couple times or more.*

Q. Do you think your voice was raised?

A. Yes.

. . . .

Q. Did your aunt ever come out and talk to them?

A. Yes.

Q. Do you remember if she said anything to them?

A. *She told them to leave several times, asked them to leave.*

Q. Was she angry as well?

A. Yeah.  She got more—she got more frustrated, yeah, because they weren't leaving.

RP at 211-12 (emphasis added).

Also objectionable, according to Mr. Dimas, was the following testimony

from Ms. Jackson:

Q. Let's talk a little bit more about that.  *Do you remember any specific statements when you asked them to leave?  Do you remember any words that come to mind that you told them?*

A. I can't remember completely offhand, no.  *I just remember telling them to get out of there.*

Q. Did you use profanity towards them?

A. Yes.

Q. Can you say what you think you would have said?

A. *I told them to get the hell out of here.  I told them—*

43

Q.     *Do you think you told them to get the fuck out of there?*

A.     *Thank you, yes.  I know I did.*

Q.     *Do you remember how many times you asked them to leave?*

A.     *Several, a lot.*

Q.     *More than twice?*

A.     *Yes.*

Q.     *Do you remember Anna telling them to leave?*

A.     *Yes.*

Q.     *Do you remember specifically what she said?*

A.     *She just said—no.  She just told them that she, you know, did
       what they asked and to leave.*

RP at 219-20 (emphasis added).

He identifies the following testimony during Ms. Jackson's cross-

examination by Mr. Crowley as objectionable:

Q.     Then did Anna push you out of the way?

A.     She kind of—no.  She didn't push.

Q.     What did she do?

A.     *She's just telling them to leave, asking them to leave.*

Q.     *Just kindly and politely asking them to leave?*

A.     *No, of course not.*

Q.     *She was aggressive?*

A.     She was trying to protect her home and *telling them to leave.*

. . . .

Q.     Okay.  So if I understand the sequence of events, at least what you're
       telling the jury, is that she raises the ax—

A.     *And said to get the F out of here, to please leave.*

> Q. Right. And was she talking to the group or was she directing that to anyone?
>
> A. She was talking to them, all of them.
>
> Q. The whole group?
>
> A. *Yes, just telling them to leave.*

RP at 240-42 (emphasis added).

> B. The complained-of testimony was not assertive, and therefore not hearsay

"Where a claim of ineffective assistance of counsel rests on trial counsel's failure to object, a defendant must show that an objection would likely have been sustained." *State v. Fortun-Cebada*, 158 Wn. App. 158, 172, 241 P.3d 800 (2010).

Hearsay is an out-of-court statement offered in court to prove the truth of the matter asserted. ER 801(c). It is generally inadmissible. ER 802. Mr. Dimas argues that testimony about the many out-of-court statements demanding that he and his confederates leave Ms. Hargett's home are "classic hearsay" because they were "offered to prove the truth of the matter asserted—that Hargett in fact told Dimas to leave, i.e. he was no longer welcome." Suppl. Br. of Pet'r at 23. But this confuses the "truth" that causes hearsay to be inadmissible. It is not whether the witness truthfully reports what was said out-of-court ("that Hargett *in fact* told Dimas to leave"). *Id*. (emphasis added). It is not that the out-of-court speaker really meant what she said ("he *was* no longer welcome"). *Id*. (emphasis added).

45

A "statement" is an oral or written assertion. ER 801(a). Put another way, a "statement" is a "'declaration of matters of fact.'" *State v. Kelly*, 19 Wn. App. 2d 434, 448, 496 P.3d 1222 (2021) (quoting *Eagle v. Unemployment Comp. Bd. of Rev.*, 659 A.2d 60, 62 (Pa. Commw. Ct. 1995)), *review denied*, 199 Wn.2d 1002, 504 P.3d 827 (2022). "A nonassertive statement does not constitute hearsay." *Id*. In *Kelly*, a case that analyzed whether a prisoner's request to his mother to send a text message to a particular recipient was hearsay (it is not), this court explained:

> When we speak of proving the truth of the matter asserted we can only be speaking of a factual assertion, not an order or a command, not a question or a request. The hearsay rule does not forbid the introduction of evidence that a request has been made when the making of the request is significant irrespective of the truth or falsity of its content.

*Id.* at 449 (citation omitted).

Like the prisoner's request to his mother in *Kelly*, the out-of-court statements that Mr. Dimas and the others needed to leave were not assertions under ER 801(a). They were requests or demands.

Met with this argument by the State, Mr. Dimas is unable to defend his position with legal authority. Mr. Dimas does respond with argument that telling him to leave was an assertion in the nature of a revocation of an implied license to be on Ms. Hargett's porch. Suppl. Reply Br. of Pet'r at 4. Context may support finding an implied assertion in the case of some requests or commands, but the trial court is not required to search for

one.  The trial court could very reasonably view these parties as engaged in demands and defiance rather than a substantive dispute over license.  "According to traditional hearsay analysis, at least, the definition of hearsay includes *only* statements describing an event or condition in the past."  5B KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE 801.3, at 329 (6th ed. 2016).

It was not deficient representation for Mr. Crowley to refrain from objecting to witness testimony about Ms. Hargett's and Ms. Jackson's demands for the Dimas group to leave, because such objections were unlikely to be sustained.

The petition is dismissed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Fearing, C.J.

_____
Pennell, J.

47